This is 22-12, 24 Wise v. DeJoy, and welcome to the University of Colorado School of Law Appellate Clinic. You may proceed, Ms. Vasiliu. Very nice. That's even harder than Timkovich. You may proceed. Good morning, your honors, and may it please the court. My name is Melba Vasiliu, and I'm here on behalf of Appellant Sheria Wise. I'll be arguing on the failure to accommodate claim today, and sharing my time. Could you hold the mic just a little bit closer to your... Yes, so sorry, your honor. Thank you. I'll be arguing the failure to accommodate claim, and my co-counsel, Mr. Jonathan Murray, will be arguing on the retaliation claim. We're students appearing under the Student Practice Act, and our professor, Matthew Cushing, is seated at the table with us. We'd like to reserve three minutes for rebuttal. Your honors, we ask that this court reverse the order of the district court, and find that the USPS failed to accommodate Ms. Wise. And I'd like to direct this court's attention to one incident in particular that demonstrates how USPS failed to accommodate Ms. Wise. Your honors, there's no dispute as to the first three elements of the failure to accommodate claim. What's at issue today is the fourth element, and whether USPS accommodated Ms. Wise, which it did not. The incident that best illustrates this is when Ms. Wise asked her supervisor at the time, Dean Leggo, for help in pushing her mail gurney. Not only did Ms. Wise not receive the help she asked for, but she was yelled at instead. This incident demonstrates how Ms. Wise satisfied each of the four elements of the failure to accommodate claim, and did not receive help from her supervisor. Did either that request or the other request that she made identify that she was disabled or needed help because of her pregnancy situation? Not disabled, but because she had special needs because of her pregnancy? Yes, your honor. In that incident in particular, Ms. Wise stated to her supervisor that because she was pregnant and gave them her restrictions, she needed help. This is additionally corroborated by the supervisor himself, and in preparing for argument today, on page 147 of the record, Mr. Leggo said that she couldn't lift because it was past her restrictions. That was made abundantly clear to Mr. Leggo at the time, and she still did not receive the help that she needed. So because of this, it's clear that it's- The post office did acquiesce to the 20 pound limit, correct? And is your position that her supervisors intentionally disregarded that accommodation or that there was some miscommunication about whether she was able to do certain types of work? Your honor, I believe there was miscommunication, but it was abundantly clear that Ms. Wise could not push, pull, or lift beyond 20 pounds. The gurney itself weighed 20 pounds on its own, regardless of whether it was filled. But what's important here is that Ms. Wise acted in line with her accommodation, and she asked for help explicitly, as she was told. And not only did she not receive this help, but she was made to cry. And looking at these facts in the light most favorable to Ms. Wise, there is a dispute here, and we can find that USPS failed to accommodate Ms. Wise. This wasn't the only incident in which Ms. Wise was asked for her accommodation and did not receive it. Her other supervisor, Ron Domingo, told her that she could leave packages behind that exceeded the 20 pound restriction that she had. And when she did exactly this, she was called back to carry those packages. Again, another instance of Ms. Wise's accommodation being explicitly ignored by her supervisors. How much should we conceive of this as an interactive process? I mean, my vision of this workplace is that there's packages and envelopes and gurneys and dollies. You know, there's a lot going on, and, you know, I doubt if there's a scale next to... Maybe there is. You know, people can weigh a package, make sure it's within her accommodation, but it And it seems like the employer or the employee ought to kind of work things out, maybe on a day-to-day basis, depending on what objects come in the door. And you know, if that's a fair interpretation, how did the post office fail in that interactive process? Because it's kind of a two-way street, isn't it? Certainly, Your Honor. It is a two-way street. And the point of the interactive process is to understand the extent of the employee's disability, what they can and cannot do, and the extent of the employer's ability to accommodate that. So two things here. One, the interactive process had already concluded. And two, Ms. Wise had met her burden. She had asked for help, and she fulfilled what she needed to do in order to make that accommodation happen. If for any reason this wasn't what the USPS could do, it was the burden of the USPS to restart the interactive process. Once it found out The interactive obligation stops once the post office agreed, we'll make accommodations on the basis of weight, and you don't think that she had any more interactive obligations in the enforcement of that policy? To the extent that she had other obligations, she met them. I don't want the to the extent. Did she or did she not have further interactive obligations? Specific to the interactive process, no. Ms. Wise had received the accommodation, and she was exercising it as she had. She could ask for help, or she could leave a package behind. She did those things, and she was denied help in those instances. And in both cases, she indicated it was because of her pregnancy? Specifically, there's testimony in the Lego incident that she asked for help. But in the Domingo incident, she was doing what she was told, to leave the package behind if it exceeded her weight restriction. And to the extent, if she needed to ask for help there, assuming that she did, these efforts could have been seen as futile because Ms. Wise was rebuffed again by her employers, and it was clear that they would not entertain her accommodation as they had explicitly denied her. Your Honor, as I see, I'm right about the time where I should cede over to my co-counsel if that's all right? Yeah. Let's hear from Mr. Murray. Thank you. By the way, congratulations. You're one of the very few lawyers who honors the commitment to give equal time to a colleague. You put an awful lot of experienced lawyers. And she's not even a lawyer yet. Thank you. I know. I think, congratulations.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you. Thank you. Certainly, Your Honor. May it please the court, Jonathan Murray for the appellant. Now, as for retaliation, the lower court erred because it failed to consider key evidence that Ms. Wise provided, that the reasons USBS gave for firing her weren't its true motivation, and that's the pretext inquiry that's at the heart of the McDonnell-Douglas framework. Now, normally, a McDonnell-Douglas analysis proceeds with the plaintiff making a prima facie case, and that's not an onerous burden as the Supreme Court said in Burdine. And then the defendant employer has to provide a reason, a legitimate reason for having fired the plaintiff. And then finally, the plaintiff gets to provide evidence that suggests that that wasn't the real reason. Again, the pretext inquiry. Now, ever since the Supreme Court in Reeves in 2000 said that pretext evidence is also relevant to the prima facie case, it essentially means that any claim governed by McDonnell-Douglas simply cannot be properly analyzed unless pretext is considered. But that's exactly the error that the lower court committed here. Specifically, the lower court claimed in its order that Ms. Wise provided no evidence of pretext with regard to any of her claims, but that's simply not true. Ms. Wise pointed the court to pretty key pieces of evidence here, and that's the inconsistencies that her supervisors, Domingo and Leggo, provided with respect to why they fired her and the fact that these two individuals were also responsible for the incidences in which her case was affected. One of the things that it appeared to be that there's somewhat of a conflation in the briefs between inconsistent explanations for the suspension and the termination. I understand that there may have been different explanations for the suspension, but I didn't see anything in the summary judgment evidence about an inconsistency in Domingo and Leggo's explanations for why she was actually terminated. It seemed to me that both of them were pretty unambiguous, that it was based on her walking off the job. Am I mistaken? Well, not quite, Your Honor, and to underappreciate the importance of this evidence and the light most favorable to Ms. Wise, it is useful to take a step back here. So within a week of her receiving these accommodations, these incidences with Domingo and Leggo are happening and it creates just so much frustration and problems on the job that Ms. Wise decides to resign. And that's what we refer to as the Westwood incident on January 21st. Now other supervisors, Sharon Wright at that time, were fully apprised of the situation and think that that's not serious enough, that Ms. Wise should stay gone. They actively try to bring her back and to rescind her resignation. But then the moment she returns, Domingo and Leggo drop fresh discipline for her. And that leads to the letters of warning and that leads to the suspension. And that suspension specifically lists, we are suspending you for absences, for missed scans and for the Westwood incident. But this notice of suspension also says, we're not going to fire you for these things. We just want to put you on notice so that your work improves. And this is a seven-day suspension, but then all of a sudden, tomorrow she's fired. And then when they're asked to explain why they fired, first the letter of separation says unacceptable work performance and that's somewhat vague. And when USPS has been asked to define what that means, that's where the inconsistency comes in. USPS claims in its briefing that it fired her for all of those things. But then Domingo and Leggo are testifying on page 119 and 123 of the record that they never would have fired her for absences or missed scans and it was just Westwood. But then a reasonable juror could notice, why are they engaging in these progressive actions and these suspensions if they always intended to fire her for Westwood in the first place? She was a probationary employee and there was at least one, correct me if I'm wrong, but there was at least one negative work review prior to her pregnancy and accommodation. As Judge Bacarab mentioned, there was her not completing a route, the Westwood incident, and there was some claims about misscanning or failing to scan documents or boxes. So cumulatively, why wouldn't those either, cumulatively or the Westwood incident as an intervening event under TWIG, why wouldn't those be adequate justifications for an adverse action? So in the honor, a few points to that. With respect to the negative evaluations she received prior to her accommodation, USPS in its, excuse me, USPS in its briefing specifically said that we didn't care about her negative evaluations when we fired her. That's on page 414 of the record. So again, in the light most favorable to Ms. Wise, a reasonable juror could certainly dismiss that as a reason they may have fired her. With respect to TWIG and the idea of the intervening event, that was appropriately considered in terms of how much temporal proximity in this case could aid Ms. Wise's prima facie case. And as TWIG says, when we have an intervening event, you can't make the prima facie case on temporal proximity alone. But again, Ms. Wise isn't trying to make her prima facie case on temporal proximity alone. She's bringing up these instances of the interference with her accommodation and these inconsistencies that work both as pretext evidence and as evidence that can satisfy her prima facie case. I see that I'm near our time we wanted to reserve for rebuttal. I don't know if there are more questions. You may reserve your rebuttal. All right. Thank you. Thank you, counsel. Thank you, your honors. You get kudos also from your lawyers covering the United States Court of Appeals. Good morning, your honors. Michael Johnson for Mr. DeJoy, the Postmaster General of the United States. The district court properly granted the government's motion for summary judgment on the two issues before this court. The district court properly found that the Postal Service reasonably accommodated Ms. Wise. The district court also properly found that the Postal Service did not fire Ms. Wise in retaliation for her accommodation. I would first like to start with the issue of the accommodation. The court heard argument from Ms. Wise regarding the two incidents, one with Mr. Leggo and the other with Mr. Domingo. Regarding the issue with Mr. Leggo, the incident with Mr. Leggo, a reasonable jury could not find it a failure to accommodate based on the evidence that was presented below regarding the Leggo incident. Ms. Wise claims that Mr. Leggo yelled at her for not following procedures on stacking gurneys, but she did not claim that Mr. Leggo yelled at her for using an accommodation. But she did testify that she told him why she needed help. But she did not say that she needed help because the gurney was too heavy to push. She said, did you tell him on page 40 of the EEOC transcript, did you tell him, Leggo, why you wanted help to push the gurney? Yes or no, actually, excuse me, sorry, because I was pregnant and I gave them my restrictions. Viewing the evidence and the like most favorable to the plaintiff, why can't we reasonably infer from her sworn testimony to the EEOC that she told Leggo specifically that she informed him of the restrictions and added that she was pregnant? We submit that a reasonable jury would have to infer too much to reach that conclusion. A jury would have to infer that when Ms. Wise said, I gave them my restrictions, that she was actually referring to restrictions that she gave to Mr. Leggo. When she said, I gave them my restrictions, a reasonable jury could determine that she was referring to the restrictions that she gave her supervisors the day after her doctor issued the order placing her on weight restrictions. Even though the question was, why, or did you tell him why you wanted help to push the gurney? Don't we need to read the answer in light of the question that she was answering? Her immediate response to that question was, yes or no, actually. She said, no, actually. So a reasonable jury could infer that she did not tell him why she wanted help in pushing the gurney. She said, no, actually. And the emphasis on actually refers to no, that she did not tell him. A jury would also have to infer that when she said, no, actually, she actually was lying. She was lying at her deposition when she said, no, actually. And a jury would not, a reasonable jury would not infer that she was lying when she said, no, actually. We submit that a jury would, a reasonable jury would not make so many inferences and would determine that she actually did inform Mr. Leggo at that time that she needed help pushing the gurney because the gurney exceeded her weight restrictions, pushing or pulling the gurney. It's not clear what she was doing at that time. How was she, how was she supposed to know whether the weight restriction was achieved or exceeded? I'm not quite sure how that was going to work. The, um, the weight restriction, Your Honor, um, was, um, was an issue that, um, uh, that, uh, um, Ms. Wise could, uh, uh, resolve herself using her own experience at the Postal Service. She had been there two and a half months when she received the notification of her weight restriction. She had already been, uh, using the mail, uh, uh, uh, devices. She'd been using a mail card essentially every day. And so she was familiar with the material, the, the system. If she thought that the accommodation was not, uh, an effective accommodation, she needed to tell the Postal Service that it was not an effective accommodation. She needed to come back to the Postal Service, but she didn't ever indicate to the Postal Services service that, uh, uh, the requirement that she estimate the weight of an object was not an effective accommodation. She wasn't required to actually accurately determine the weight of an object. She could just eyeball it. She could nudge an object, uh, using a slight amount of force. And, uh, if she determined, uh, uh, based on her, uh, own evaluation that an object weighed 20 pounds or more, and she told the Postal Service that they were to, uh, accept her statement and they were to assist her with the object. Is that part of the policy to specifically say that if she estimated it to be 20 pounds or more, that the postal employees had to accept that?  That's in the record. Yes. I believe that's, uh, Mr. Domingo, Mr. Leggo, I believe Ms. Creek also, uh, made statements regarding that. I'm, I don't have those exact sites, but there's, there's no dispute, Ms. Weiss is not claiming that the Postal Service would, would fail to agree with her if she indicated that, uh, an object weighed 20 pounds or more. As I understand counsel's argument, uh, she perceived that there was some hostility towards her by supervisors because of the accommodation that she requested and received. What do we, what do we make of this claim that she was harassed or, you know, made, you know, made, made the feel that she, you know, guilty about asking for an accommodation? The record doesn't support that, that, uh, the Postal Service, uh, um, um, treated her in a way, uh, based on her, um, accommodation or her requests that the Postal Service abide by her accommodation. Um, as to the Leggo incident, um, Mr. Leggo, uh, the facts don't indicate that Mr. Leggo yelled at her because she was seeking to, uh, uh, uh, uh, uh, allow the Postal, have the Postal Service provide her the accommodation pursuant to her doctor's orders. Uh, the Postal Service, uh, the records simply show that, that he yelled at her for not stacking gurneys, but there isn't any explanation in the record as to, uh, what that meant. So it's, uh, there's, there's no indication that he yelled at her specifically because she requested, uh, the Postal Service to abide by her accommodation. As to the incident involving Mr. Domingo, Mr. Domingo, um, actually took the initiative initially to, uh, uh, assist Ms. Wise that morning, the, the date of the incident with Mr. Domingo, um, he reminded Ms. Wise of her weight restrictions. He told her to, he told her that if, that if she thought a package was, uh, uh, outside of her, uh, uh, weight limitations to leave it at the station, and in fact, she did leave a few packages at the station that morning, um, and then when he called her on the route later and asked her, uh, uh, to come back and deliver those packages, that doesn't indicate that the Postal Service or Mr. Domingo, uh, um, had some, uh, um, improper attitude or improper, uh, uh, motive towards Ms., Ms. Wise. Um, at time it elapsed between the initial, uh, uh, uh, incident in the morning when Mr. Domingo allowed her to leave the packages at the station, uh, she was out on her route and doing work. Mr. Domingo was a supervisor at the station, and he was very busy, and he was managing other, uh, employees at the time, and that a postal station is a very dynamic environment. Um, there's nothing in the records to, to, to indicate that he had some improper animus when he called her on the phone later, and, and in fact, this court doesn't specifically need to know why he called her later in the day to, uh, uh, uh, deliver those packages. Ms., uh, Wise, uh, agrees in this case that part of her accommodation was the requirement that she tell a manager or another employer to assist with heavy packages. This is, uh, the record on appeal at, uh, pages 103 and 104, paragraph 18. There's no dispute that she agrees that that is part of her accommodation, but when Mr. Domingo called her on the phone, she didn't remind him of the fact that he had, uh, earlier told her to, uh, uh, leave those packages at the station. She didn't remind him of her accommodation. She simply said, okay. So she didn't comply with that aspect of the accommodation that would allow the Postal Service to provide her what she needed to, uh, um, protect herself and, and, uh, and, uh, uh, assist her consistent with her medical, uh, orders. The Postal Service, um, she, she tent, attempted to resign. The service, um, did not accept the resignation. Then they, then they, I suppose they felt they could have terminated her. They put her on a seven day suspension, which would suggest, um, that she's going to return to work and then she was terminated. I mean, that, that's, seems like a, uh, evolving situation and it's only a couple of weeks since she asked for or received an accommodation. So we certainly have a proximity and time question here, but, um, coun, counsel posits that these inconsistencies in explanation casts, you know, doubt on the, on the legitimacy of the, of the, uh, termination rationale. Um, we submit that the reason for her, her termination did not shift. Uh, she was terminated because she abandoned her, her route. Um, and, uh. That's not the, the, the district court didn't make that determination that it was exclusively because of abandonment, did he? I thought that, I thought that he said that, that they asserted a whole range of options. Now, the district court did say that the abandonment terminated some previous events, but in terms of what the postal service argued, they asserted a whole range of violations, right? They did, but the, but the postal service then in the postal services replied to, uh, to its own, uh, motion for summary judgment, the postal service, uh, ultimately disclaimed the letters of warning and the other reasons that, uh, had been submitted in the letters of warning as basis for the termination. This is the record on appeal at pages 413 to 414. And the postal service, uh, to the district court stated that the, the reason for her termination was that she abandoned her route. Now, there were other reasons that were set forth in the letters of warning, uh, uh, but the purpose of the letters of warning, uh, was to, uh, attempt to assist Ms. Wise as she was moving through the probationary period to, uh, help, help her, uh, address certain deficiencies so that she would, uh, successfully complete her probationary period. And that, that is why the letters of warning were issued to advise her, uh, of, of certain, uh, aspects of her, uh, work performance that she needed to, to, uh, improve on. As the record shows that the, uh, uh, the, the rate of success of probationary employees who are mail carriers at the postal service is actually quite low. It's a very difficult job. But, but, but you're saying that the evidence is that the postal service clearly said you're being discharged for one reason, that is abandonment. That's correct. And in our answer brief, we did, uh, point out these other, uh, uh, reasons why, uh, she was properly discharged. We, we concede that, uh, uh, that the postal service disclaimed those reasons, those other reasons, and that the sole reason for her termination was her abandonment of her route. Uh, and, and that's clear. We submit from pages 413 to 414 of the, of the record. Isn't that the reason for the suspension? The, the reason for the suspension, uh, was in part for that as well. Uh, but her ultimate termination was, uh, uh, proper because she term, she abandoned her route. There is probably no, no more significant, um, miscue or, or error that a mail carrier can make than abandoning the route because... But what about the, what about the fact that they allowed her to come back in to work? That was a, that was an effort, uh, initially to try to, to determine if she could, uh, remain as a probationary employee. But during the process of evaluating, uh, the situation, the, the postal service ultimately came to the conclusion that, that, uh, they could not retain her as, as an employee and they, she was terminated. But it had to be for something other than abandonment because they knew about the abandonment and still let her come back. They did, but the ultimate determination, uh, uh, uh, took several more days and, and before the postal service ultimately determined to terminate her. So, so she was placed, she was, uh, allowed to come back, uh, while the postal service was then, uh, contemplating ultimately how to address the situation. But the, the, because she was allowed to come back, uh, for that period of time doesn't suggest that the postal service's, uh, reason for, uh, terminating her, uh, was in retaliation for her, uh, accommodation. I, I note that I only have a few seconds left. If the court has no other questions, we had asked that the, the ruling of the district court be affirmed. Thank you. Thank you, counsel. And Ms. Wise, do you have some rebuttal? Your Honors, just two quick points on rebuttal. Uh, first, in looking at the statement that Ms. Wise made to LEGO, uh, in asking for help with the gurney, while opposing counsel points out that there could be some inconsistencies with the statement, it's important to note that LEGO himself corroborated that she asked for help because of her restriction. This is on page 147 of the record. And even if there are still ambiguities of what actually happened, this is a question for the jury to decide. There are enough facts in this case, uh, in the record and brought up throughout briefing to show that Ms. Wise, uh, met her burden in the accommodation and that the USPS actually failed to accommodate her. Uh, second, relating specifically to failure to accommodate, uh, when Domingo called her back for the packages, this was a clear rejection of the accommodation that they agreed to. Leaving the packages behind was enough of a communication indicating that they exceeded her weight restriction. And so, although Domingo called her back, that's exactly the point. He called her back as a rejection of her accommodation, again, illustrating how USPS failed to accommodate Ms. Wise. Uh, and finally, a point on the retaliation claim, uh, the inconsistency in stating what reason was ultimately why Ms. Wise was fired demonstrates that, uh, Ms., that summary judgment was inappropriate. Uh, further, uh, because of the shifting reasons is plainly inconsistent and we cannot, because despite the Westwood incident, there was still inconsistency and that's enough pretext that the district court should have considered. And what, what, and just, what, what is the, I mean, the key inconsistency between the Westwood incident, which sounds like a pretty serious, um, situation for a probationary employee. I mean, what's, what's, what's the fact we're going to look at and say, okay, a jury can find this in her favor and find pretext? Uh, the fact that we would look at in this case is looking at the letter of suspension. The letter of suspension had, uh, areas that it had identified for improvement, saying that Ms. Wise would not be fired for those. And then the very next day, Ms. Wise was fired for the Westwood incident. Uh, because of this, your honors, we ask that this court reverse the findings of the district court and find that, uh, USPS failed to accommodate Ms. Wise and fired her in retaliation for her, her accommodation. Thank you. Thank you, counsel. Counsel are excused and the case is submitted.